HOBBY *v.* UNITED STATES

No. 82–2140.   Argued April 25, 1984—Decided July 2, 1984

340

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and STEVENS, JJ., joined, *post*, p. 350. STEVENS, J., filed a dissenting opinion, *post*, p. 362.

*Daniel H. Pollitt* argued the cause and filed briefs for petitioner.

*Joshua I. Schwartz* argued the cause for the United States. With him on the brief were *Solicitor General Lee, Assistant Attorney General Trott,* and *Deputy Solicitor General Wallace.**

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to resolve a conflict among the Circuits as to whether discrimination in the selection of federal grand jury foremen, resulting in the underrepresentation of Negroes and women in that position, requires reversal of the conviction of a white male defendant and dismissal of the indictment against him.

I

Petitioner, a white male, was indicted on one count of conspiring to defraud the United States of funds appropriated under the Comprehensive Employment and Training Act of 1973, 29 U. S. C. § 801 *et seq.* (CETA), in violation of 18 U. S. C. §§ 371 and 665, and three counts of fraudulently ob-

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *William Van Alstyne, Sara Sun Beale, Burt Neuborne,* and *Charles S. Sims;* and for the NAACP Legal Defense and Educational Fund, Inc., by *Jack Greenberg, James M. Nabrit III,* and *Charles Stephen Ralston.*

taining and misapplying CETA grant funds, in violation of 18 U. S. C. § 665. Prior to trial in the United States District Court for the Eastern District of North Carolina, petitioner moved for dismissal of the indictment against him "due to improper selection of grand jurors." App. 32. In particular, he alleged that the grand jury selection plan "exclude[d] citizens from service . . . on account of race, color, economic status and occupation, in violation of . . . the Fifth and Sixth Amendments of the United States Constitution." *Id.*, at 33.

At an evidentiary hearing on the motion to dismiss, petitioner introduced the testimony of a statistical social science consultant regarding the characteristics of the persons selected as grand jury foremen or deputy foremen in the Eastern District of North Carolina between 1974 and 1981. The expert witness reported that none of the 15 grand juries empaneled during this 7-year period had had a Negro or female foreman. Of the 15 deputies appointed during this interval, so this expert testified, 3 had been Negroes and 6 had been women. From these data the expert witness concluded that Negroes and women were underrepresented among grand jury foremen and deputy foremen serving in the Eastern District of North Carolina. Rejecting petitioner's claim of discrimination in the selection process, the District Court denied petitioner's motion to dismiss the indictment, and petitioner was convicted after a jury trial.

The United States Court of Appeals for the Fourth Circuit affirmed. 702 F. 2d 466 (1983). Reasoning that the foreman of a federal grand jury performs a strictly ministerial function, the Court of Appeals viewed the foreman's impact upon the justice system and the rights of criminal defendants as minimal and incidental at most. In response to petitioner's contention that appointment as foreman may enlarge an individual's capacity to influence the other grand jurors, the Court of Appeals concluded that this likelihood was too vague and speculative to warrant dismissals of indictments and reversals of convictions.

The Court of Appeals recognized that in *Rose* v. *Mitchell*, 443 U. S. 545, 551–552, n. 4 (1979), this Court assumed without deciding that discrimination in the selection of the foreman of a *state* grand jury would require that a subsequent conviction be set aside. The Court of Appeals noted, however, that the function of the grand jury foreman in the federal system differs substantially from the role of the grand jury foreman in the states. The court concluded that the rights of defendants are fully protected by assuring that the composition of the federal grand jury as a whole is not the product of discriminatory selection.

We granted certiorari to resolve a conflict among the Circuits on this issue,[1] 464 U. S. 1017 (1983), and we affirm.

## II

## A

It is well settled, of course, that purposeful discrimination against Negroes or women in the selection of federal grand jury foremen is forbidden by the Fifth Amendment to the Constitution. The question presented here, however, is the narrow one of the appropriate remedy for such a violation. It is only the narrow question of the remedy that we consider. No factual evidence was presented to the District Court on the issue of discrimination; instead, petitioner relied

---

[1] Compare *United States* v. *Aimone*, 715 F. 2d 822 (CA3 1983) (discrimination in federal grand jury foreman selection does not raise constitutional concerns); 702 F. 2d 466 (CA4 1983) (case below) (same); *United States* v. *Coletta*, 682 F. 2d 820 (CA9 1982) (alleged discrimination in federal grand jury foreman selection insufficient to imply due process violation), cert. denied, 459 U. S. 1202 (1983), with *United States* v. *Cross*, 708 F. 2d 631 (CA11 1983) (position of federal grand jury foreman constitutionally significant); *United States* v. *Perez-Hernandez*, 672 F. 2d 1380 (CA11 1982) (discrimination in selection of federal grand jury foreman may require reversal of conviction; defendant failed to establish such discrimination). See also *United States* v. *Cronn*, 717 F. 2d 164 (CA5 1983) (white male defendant lacks standing to press equal protection challenge to discrimination in selection of federal grand jury foreman; constitutional significance of foreman not addressed).

upon inferences to be drawn from the failure to select a woman or Negro as foreman of the grand jury for the seven years studied. As did the Court of Appeals, we proceed on the assumption that discrimination occurred in order to treat the constitutional issue presented by the motion to dismiss.

Invoking the Due Process Clause of the Fifth Amendment, petitioner argues that discrimination in the selection of grand jury foremen requires the reversal of his conviction and dismissal of the indictment against him. In *Peters* v. *Kiff*, 407 U. S. 493 (1972), the opinion announcing the judgment discussed the due process concerns implicated by racial discrimination in the composition of grand and petit juries as a whole. Emphasizing the defendant's due process right to be fairly tried by a competent and impartial tribunal, see *In re Murchison*, 349 U. S. 133, 136 (1955), the opinion reasoned that unconstitutionally discriminatory jury selection procedures create the appearance of institutional bias, because they "cast doubt on the integrity of the whole judicial process." 407 U. S., at 502. Moreover, the opinion perceived an important societal value in assuring diversity of representation on grand and petit juries:

> "When any large and identifiable segment of the community is excluded from jury service, the effect is to remove from the jury room qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable. It is not necessary to assume that the excluded group will consistently vote as a class in order to conclude, as we do, that its exclusion deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." *Id.*, at 503–504 (footnote omitted).[2]

---

[2] *Peters* held that a white male had standing to bring a racial-discrimination challenge to the system used to select his grand and petit juries. JUSTICE MARSHALL, in an opinion joined by Justices Douglas and Stewart, reasoned that the defendant had standing to assert a denial of due process of law. 407 U. S., at 504. JUSTICE WHITE, in an opinion joined by JUS-

Discrimination in the selection of grand jury foremen—as distinguished from discrimination in the selection of the grand jury itself—does not in any sense threaten the interests of the defendant protected by the Due Process Clause. Unlike the grand jury itself, the office of grand jury foreman is not a creature of the Constitution; instead, the post of foreman was originally instituted by statute for the convenience of the court. See 28 U. S. C. § 420 (1934 ed.); Rev. Stat. § 809 (1878). Today, authority for the appointment of a grand jury foreman is found in Federal Rule of Criminal Procedure 6(c), which provides:

"The court shall appoint one of the jurors to be foreman and another to be deputy foreman. The foreman shall have power to administer oaths and affirmations and shall sign all indictments. He or another juror designated by him shall keep a record of the number of jurors concurring in the finding of every indictment and shall file the record with the clerk of the court, but the record shall not be made public except on order of the court. During the absence of the foreman, the deputy foreman shall act as foreman."

Rule 6(c) has somewhat ancient roots, cast as it is in what are now obsolete terms: foreman and deputy foreman. Centuries of usage, relating back to a day when women did not serve on juries, have embedded such terms in the law as in our daily vocabulary. However, it is not for us to amend the Rule outside the processes fixed by Congress for rulemaking; that is a task for the appropriate committees and the Judicial Conference of the United States.

As Rule 6(c) illustrates, the responsibilities of a federal grand jury foreman are essentially clerical in nature: adminis-

---

TICES BRENNAN and POWELL, concluded that standing would implement the strong statutory policy of 18 U. S. C. § 243, which provides that no qualified citizen "shall be disqualified for service as grand or petit juror in any court of the United States, or of any State on account of race, color, or previous condition of servitude. . . ." *Id.*, at 505–507.

tering oaths, maintaining records, and signing indictments. The secrecy imperative in grand jury proceedings demands that someone "mind the store," just as a secretary or clerk would keep records of other sorts of proceedings. But the ministerial trappings of the post carry with them no special powers or duties that meaningfully affect the rights of persons that the grand jury charges with a crime, beyond those possessed by every member of that body. The foreman has no authority apart from that of the grand jury as a whole to act in a manner that determines or influences whether an individual is to be prosecuted. Even the foreman's duty to sign the indictment is a formality, for the absence of the foreman's signature is a mere technical irregularity that is not necessarily fatal to the indictment. *Frisbie* v. *United States*, 157 U. S. 160, 163–165 (1895).

As the Court of Appeals noted, the impact of a federal grand jury foreman upon the criminal justice system and the rights of persons charged with crime is "minimal and incidental at best." 702 F. 2d, at 471. Given the ministerial nature of the position, discrimination in the selection of one person from among the members of a properly constituted grand jury can have little, if indeed any, appreciable effect upon the defendant's due process right to fundamental fairness. Simply stated, the role of the foreman of a federal grand jury is not so significant to the administration of justice that discrimination in the appointment of that office impugns the fundamental fairness of the process itself so as to undermine the integrity of the indictment.

Nor does discrimination in the appointment of grand jury foremen impair the defendant's due process interest in assuring that the grand jury includes persons with a range of experiences and perspectives. The due process concern that no "large and identifiable segment of the community [be] excluded from jury service," *Peters* v. *Kiff*, 407 U. S., at 503, does not arise when the alleged discrimination pertains only to the selection of a foreman from among the members of a properly constituted federal grand jury. That the grand

jury in this case was so properly constituted is not questioned. No one person can possibly represent all the "qualities of human nature and varieties of human experience," *ibid.*, that may be present in a given community. So long as the composition of the federal grand jury *as a whole* serves the representational due process values expressed in *Peters*, discrimination in the appointment of one member of the grand jury to serve as its foreman does not conflict with those interests.

The ministerial role of the office of federal grand jury foreman is not such a vital one that discrimination in the appointment of an individual to that post significantly invades the distinctive interests of the defendant protected by the Due Process Clause. Absent an infringement of the fundamental right to fairness that violates due process, there is no basis upon which to reverse petitioner's conviction or dismiss the indictment.

## B

Petitioner argues that the Court's decision in *Rose* v. *Mitchell*, 443 U. S. 545 (1979), supports his position that discrimination in the selection of federal grand jury foremen warrants the reversal of his conviction and dismissal of the indictment against him. In *Rose*, two Negro defendants brought an equal protection challenge to the selection of grand jury foremen in Tennessee. The Court rejected the view that claims of grand jury discrimination should be considered harmless error when raised by a defendant who had been convicted by a properly constituted petit jury at an error-free trial on the merits, and adhered to the position that discrimination in the selection of the grand jury was a valid ground for setting aside a criminal conviction. *Id.*, at 551–559. The Court then assumed *"without deciding"* that discrimination with regard to the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the

entire grand jury venire." *Id.*, at 551–552, n. 4 (emphasis added). The Court concluded, however, that the defendants were not entitled to have their convictions set aside because they had failed to make out a prima facie case of discrimination in violation of the Equal Protection Clause with regard to the selection of grand jury foremen. *Id.*, at 564–574.

Petitioner's reliance upon *Rose* is misplaced. *Rose* involved a claim brought by two Negro defendants under the Equal Protection Clause. As members of the class allegedly excluded from service as grand jury foremen, the *Rose* defendants had suffered the injuries of stigmatization and prejudice associated with racial discrimination. The Equal Protection Clause has long been held to provide a mechanism for the vindication of such claims in the context of challenges to grand and petit juries. See, *e. g.*, *Castaneda* v. *Partida*, 430 U. S. 482 (1977); *Hernandez* v. *Texas*, 347 U. S. 475 (1954); *Strauder* v. *West Virginia*, 100 U. S. 303 (1880). Petitioner, however, has alleged only that the exclusion of women and Negroes from the position of grand jury foreman violates his right to fundamental fairness under the Due Process Clause. As we have noted, discrimination in the selection of federal grand jury foremen cannot be said to have a significant impact upon the due process interests of criminal defendants. Thus, the nature of petitioner's alleged injury and the constitutional basis of his claim distinguish his circumstances from those of the defendants in *Rose*.

Moreover, *Rose* must be read in light of the method used in Tennessee to select a grand jury and its foreman. Under that system, 12 members of the grand jury were selected at random by the jury commissioners from a list of qualified potential jurors. The foreman, however, was separately appointed by a judge from the general eligible population at large. The foreman then served as "'the thirteenth member of each grand jury organized during his term of office, having equal power and authority in all matters coming before the grand jury with the other members thereof.'" *Rose*

v. *Mitchell, supra,* at 548, n. 2 (quoting Tenn. Code Ann. § 40–1506 (Supp. 1978)). The foreman selection process in *Rose* therefore determined not only who would serve as presiding officer, but also who would serve as the 13th voting member of the grand jury. The result of discrimination in foreman selection under the Tennessee system was that 1 of the 13 grand jurors had been selected as a voting member in an impermissible fashion. Under the federal system, by contrast, the foreman is chosen from among the members of the grand jury after they have been empaneled, see Fed. Rule Crim. Proc. 6(c); the federal foreman, unlike the foreman in *Rose,* cannot be viewed as the surrogate of the judge. So long as the grand jury itself is properly constituted, there is no risk that the appointment of any one of its members as foreman will distort the overall composition of the array or otherwise taint the operation of the judicial process.

Finally, the role of the Tennessee grand jury foreman differs substantially from that of the foreman in the federal system. The Tennessee foreman had the following duties:

> "He or she is charged with the duty of assisting the district attorney in investigating crime, may order the issuance of subpoenas for witnesses before the grand jury, may administer oaths to grand jury witnesses, must endorse every bill returned by the grand jury, and must present any indictment to the court in the presence of the grand jury. . . . The absence of the foreman's endorsement makes an indictment 'fatally defective.' *Bird* v. *State,* 103 Tenn. 343, 344, 52 S. W. 1076 (1899)." *Rose* v. *Mitchell, supra,* at 548, n. 2.

The investigative and administrative powers and responsibilities conferred upon the grand jury foreman in Tennessee, who possessed virtual veto power over the indictment process, stand in sharp contrast to the ministerial powers of the federal counterpart, who performs strictly clerical tasks and whose signature on an indictment is a mere formality.

*Frisbie* v. *United States,* 157 U. S. 160 (1895); see *supra,* at 344–345.

Given the nature of the constitutional injury alleged in *Rose,* the peculiar manner in which the Tennessee grand jury selection operated, and the authority granted to the one who served as foreman, the Court assumed in *Rose* that discrimination with regard to the foreman's selection would require the setting aside of a subsequent conviction, "just as if the discrimination proved had tainted the selection of the entire grand jury venire." *Rose* v. *Mitchell,* 443 U. S., at 551–552, n. 4. No such assumption is appropriate here, however, in the very different context of a due process challenge by a white male to the selection of foremen of federal grand juries.

## III

At oral argument, petitioner eschewed primary reliance upon any particular constitutional provision and instead invoked this Court's supervisory power over the federal courts as a basis for the relief he seeks. Tr. of Oral Arg. 4–5, 7, 13–14. Only by setting aside his conviction and dismissing the indictment against him, petitioner urges, will this Court deter future purposeful exclusion of minorities and women from the post of federal grand jury foreman. It is true that this Court's "supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence." *McNabb* v. *United States,* 318 U. S. 332, 340 (1943). See *United States* v. *Hasting,* 461 U. S. 499 (1983). However, we decline petitioner's invitation to embark upon the course of vacating criminal convictions because of discrimination in the selection of foremen. Less Draconian measures will suffice to rectify the problem.

In no sense do we countenance a purposeful exclusion of minorities or women from appointment as foremen of federal grand juries. We are fully satisfied that the district judges charged with the appointment of grand jury foremen will see to it that no citizen is excluded from consideration for service

in that position on account of race, color, religion, sex, national origin, or economic status. Cf. 28 U. S. C. § 1862.

## IV

We hold that, assuming discrimination entered into the selection of federal grand jury foremen, such discrimination does not warrant the reversal of the conviction of, and dismissal of the indictment against, a white male bringing a claim under the Due Process Clause. Accordingly, the judgment of the United States Court of Appeals for the Fourth Circuit is

*Affirmed.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE STEVENS join, dissenting.

The majority assumes that a judge of the United States District Court for the Eastern District of North Carolina purposefully discriminated against Negroes and women in selecting the foreman of the grand jury that indicted petitioner. The majority recognizes that such discrimination is unconstitutional. The Court concludes, however, that dismissal of petitioner's indictment is unwarranted because "the impact of a federal grand jury foreman upon the criminal justice system and the rights of persons charged with crime is 'minimal and incidental at best,'" *ante,* at 345 (citation omitted), thereby rendering the relief petitioner requests incommensurate with the injury he received. I dissent because the Court errs in its assessment of (I) the dimensions of the injury to the criminal justice system caused by discrimination in the selection of grand jury foremen, (II) the dimensions of the injury to an individual defendant, and (III) the relative social costs that would likely be imposed by dismissing petitioner's indictment compared to the costs that are likely to be exacted by the Court's resolution of this case.

## I

An established principle of this Court's jurisprudence is that the injury caused by race and sex discrimination in the

formation of grand and petit juries is measured not only in terms of the actual prejudice caused to individual defendants but also in terms of the injury done to public confidence in the integrity of the judicial process. For example, in *Peters* v. *Kiff*, 407 U. S. 493 (1972), this Court reversed a Court of Appeals that had denied federal habeas corpus relief to a white defendant convicted in state court who had challenged his indictment on the ground that Negroes had been excluded from his grand jury. The State argued that, absent a showing of actual bias, the convicted defendant was not entitled to dismissal of his indictment. Three Justices, in the opinion announcing the judgment, rejected this argument on the ground that it took "too narrow a view of the kinds of harm that flow from discrimination" in grand jury selection. *Id.*, at 498. They declared that dismissal of the indictment was required because "[i]llegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well." *Id.*, at 502–503.

This theme was reaffirmed in *Rose* v. *Mitchell*, 443 U. S. 545 (1979). In *Rose*, we held that two state prisoners who sought federal habeas corpus relief had failed to present a prima facie case that the foreman of the grand jury that indicted them had been selected in a discriminatory manner. We strongly suggested, however, that proven discrimination would support the dismissal of an indictment. The Court again rebuffed the view that dismissal of an indictment was unwarranted. Instead, the Court reiterated its longstanding belief that dismissal was required regardless of the actual harm inflicted upon any particular defendant because "larger concerns," *id.*, at 555, were implicated:

> "Discrimination on the basis of race, odious in all respects, is especially pernicious in the administration of justice. Selection of members of a grand jury because they are of one race and not another destroys the ap-

pearance of justice and thereby casts doubt on the integrity of the judicial process . . . . [S]uch discrimination 'not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government.' . . . 'The injury is not limited to the defendant—there is injury to the jury system, to the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts.'" *Id.*, at 555–556 (citation omitted).[1]

There is good reason why public confidence in the integrity of the judiciary is diminished whenever invidious prejudice seeps into its processes. This diminution of confidence largely stems from a recognition that the institutions of criminal justice serve purposes independent of accurate factfinding. These institutions also serve to exemplify, by the manner in which they operate, our fundamental notions of fairness and our central faith in democratic norms.[2] They reflect what we demand of ourselves as a Nation committed to fairness and equality in the enforcement of the law. That is why discrimination "is especially pernicious in the administration of justice," why its effects constitute an injury "to the law as an institution," why its presence must be eradicated root and branch by the most effective means available.

---

[1] Cf. *Ballard* v. *United States*, 329 U. S. 187 (1946): "[E]xclusion of women from jury panels may at times be highly prejudicial to the defendants. But reversible error does not depend on a showing of prejudice in an individual case. The evil lies in the admitted exclusion of an eligible class or group in the community in disregard of the prescribed standards of jury selection." *Id.*, at 195.

[2] "In a government of laws, existence of the government will be imperilled if it fails to observe the laws scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example." *Olmstead* v. *United States*, 277 U. S. 438, 485 (1928) (Brandeis, J., dissenting).

The majority argues that the constitutional violation that assumably occurred does not warrant dismissal of petitioner's indictment because the functions performed by a federal grand jury foreman are so incidental that discriminatory selection with respect to that post poses no substantial threat that petitioner was actually prejudiced *or* that the judicial process will be impugned in the mind of the public. The majority observes that, in contrast to *Peters* v. *Kiff, supra,* petitioner alleges only that Negroes and women were improperly excluded from the post of grand jury foreman and not that they were excluded from the grand jury as a whole. It posits that the observant public will realize that the tainted selection practice is simply too unimportant to justify an overall loss of confidence in the proceedings inasmuch as the foreman was chosen from an unobjectionable venire, has no more voting power than any other grand juror, and performs tasks that are merely ministerial.

The vice of this argument is that by focusing exclusively upon the role of the grand jury foreman it disregards the true dimensions of the violation. After all, the foreman was not the perpetrator of the constitutional violation. The persons assumed to have purposefully excluded Negroes and women from consideration for the foreman position were judges of the United States District Court. A judge is supposed to be the very embodiment of evenhanded justice. Society reveals its confidence that a judge will attend to his official duties without illicit regard for race or sex or other irrelevant characteristics by entrusting to him wide discretionary authority. The idea that a person occupying such a powerful and sensitive position would discriminate on the basis of race and sex in selecting grand jury foremen is extraordinarily disquieting and will be so to the public. For it is unlikely that a judge who engages in racist and sexist appointment practices will confine his prejudicial attitudes and actions to the area of foreman selections. More likely is that the

presence of unconstitutional discrimination in that area is but a portion of a widespread region of tainted decisionmaking.

Furthermore, by allocating authority within the grand jury venire on the basis of race and sex, the judge who assumably discriminated against Negroes and women helped to perpetuate well-known and vicious stereotypes that our society has been struggling to erase. To denigrate the significance of the judge's violation by characterizing its effect as "minimal and incidental" exposes the judiciary to justified charges of hypocrisy.

## II

With respect to the issue whether petitioner himself was harmed by the violation, the majority concludes that discrimination in the selection of a grand jury foreman "can have little, if indeed any, appreciable effect upon the defendant's due process right to fundamental fairness." *Ante,* at 345. To justify this conclusion the Court first attempts to distinguish this case from *Peters* v. *Kiff,* 407 U. S. 493 (1972), where the defendant challenged the selection of the grand jury as a whole. In the Court's view, "[d]iscrimination in the selection of grand jury foremen—as distinguished from discrimination in the selection of the grand jury itself—does not in any sense threaten the interests of the defendant protected by the Due Process Clause." *Ante,* at 344. To buttress this distinction, the majority observes that "[u]nlike the grand jury itself, the office of grand jury foreman is not a creature of the Constitution" but was "originally instituted by statute for the convenience of the court." *Ibid.* This observation is useful, I suppose, as a revelation of antiquarian fact; however, it is utterly unconvincing as an explanation of why we must presume, as a matter of law, that discrimination in the selection of grand jury foremen can have no appreciable effect upon a defendant's right to fair proceedings. Neither the United States district courts nor the United States courts of appeals are creatures of the

Constitution; both were established pursuant to statute.[3]   I assume, however, that their legislative as opposed to constitutional origins does not attenuate their crucial importance in the federal judicial scheme.

Another factor the majority focuses upon as a way of distinguishing *Peters* v. *Kiff, supra,* from the case at hand is that in *Peters* the exclusion of Negroes from the grand jury venire had impaired the defendant's interest in "assuring that the grand jury includes persons with a range of experiences and perspectives." *Ante,* at 345.   By contrast, in this case, the discrimination did not affect the composition of the grand jury but rather its internal organization: the process by which a foreman was selected.   The majority contends that the discrimination flowing from that process does not implicate the concerns raised by *Peters* because no one person can possibly represent the variety of backgrounds and perspectives found in a given community.   *Ante,* at 346.   This contention should be rejected because it mistakenly applies the principle for which *Peters* stands.   *Peters* stands for the proposition that a defendant is entitled to have his case screened by a grand jury venire from which no segment of the community has been improperly excluded.   What that principle means, in the context of this case, is that petitioner was entitled to a foreman selection process from which neither Negroes nor women were excluded merely on the basis of their race or their sex.   While petitioner was not entitled to a Negro or woman foreman, he was entitled to at least the possibility of having a woman or Negro foreman.   That possibility was nullified by the purposeful discrimination that presumably occurred in this case.

To establish that the influence exerted by a federal foreman's position is "minimal and incidental" the Court looks

---

[3] See U. S. Const., Art. III, § 1 ("The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish").

356

principally to Rule 6(c) of the Federal Rules of Criminal Procedure. The trouble with the Court's approach is that, by concentrating on the formal responsibilities of a foreman as delineated by Rule 6(c), it ignores powers and duties of the foreman that have developed "by custom, practice, and necessity." *United States* v. *Cross*, 708 F. 2d 631, 637–638 (CA11 1983).[4] A realistic understanding of the actual function performed by federal grand jury foremen must be supplemented by additional sources of evidence. One such source is the Handbook for Federal Grand Jurors (1980) (Handbook), prepared by the Judicial Conference Committee on the Operation of the Jury System. The Handbook "was recommended by the Judicial Conference for use in the United States District Courts to orient and prepare newly impaneled grand jurors." *Id.*, at 3. Its mission was to explain to grand jurors "clearly and simply" their obligations and duties. *Ibid.* The Handbook informs grand jurors that the court will appoint one of them to be "the foreman, or presiding officer, of the grand jury," *id.*, at 9; that if an emergency prevents attendance at a meeting, the affected grand juror "must promptly advise the grand jury foreperson, who has the authority to excuse" a grand juror's absence, *id.*, at 25; that the foreman administers the oath to witnesses before the grand jury, *id.*, at 11; that the foreman initiates the juror's questioning of witnesses, *id.*, at 26; that the foreman determines whether an interpreter is required, *id.*, at 11;

---

[4] Even if I limited my analysis to the information provided by Rule 6(c), I would still maintain that the foreman's job is sufficiently consequential that discrimination in the means of selecting someone to perform it could actually prejudice a defendant. The very designation by the judge that one person will serve as foreman importantly differentiates that person from the other members of the venire. See *United States* v. *Cross*, 708 F. 2d, at 637 ("A foreperson has only one vote on the grand jury, but the selection by the district judge might appear to the other grand jurors as a sign of judicial favor which could endow the foreperson with enhanced persuasive influence over his or her peers").

that the foreman initiates deliberations, tallies the votes, and reports the grand jury's conclusions to the court, *id.*, at 13.

The description of the foreman's role provided by the Handbook is more detailed than that offered by Rule 6(c) and more attuned to what is expected of the foreman in his day-to-day responsibility for presiding over the grand jury. This description portrays a post that is far more than merely clerical in nature; rather, it portrays a post that enables, indeed requires, a person to be first among equals within the grand jury room.

The Handbook's description is corroborated by the testimony of District Court Judges who have testified under oath as to the qualities they look for in selecting a grand jury foreman. See *United States* v. *Breland,* 522 F. Supp. 468, 471–474 (ND Ga.); *United States* v. *Manbeck,* 514 F. Supp. 141, 150 (SC 1981); *United States* v. *Northside Realty Associates, Inc.,* 510 F. Supp. 668, 683–684 (ND Ga. 1981); *United States* v. *Holman,* 510 F. Supp. 1175 (ND Fla. 1981); *United States* v. *Jenison,* 485 F. Supp. 655, 665–666 (SD Fla. 1979). Two patterns emerge from such testimony. First, district judges typically allocate considerable time and attention to the selection of grand jury foremen.[5] If the foreman's post is as insignificant as the majority contends, there would be little reason for district judges to be as concerned as they are with finding persons with the requisite qualities that make for a good foreman. Second, District Judges have testified that they typically select as foremen those who have "good management skills, strong occupational experience, the abil-

---

[5] For example, in *United States* v. *Breland,* the court indicated that one District Judge had testified that, before selecting a foreman he "considered each [grand juror] questionnaire, making several tentative choices before reaching a final decision." 522 F. Supp., at 473. The court indicated that another District Judge "reviewed every juror questionnaire . . . then observed prospective grand jurors in the courtroom as they were identified and answered the roll call . . . ." *Ibid.*

ity to preside, good educational background, and personal leadership qualities." *United States* v. *Cross, supra,* at 636 (summarizing testimony adduced in *United States* v. *Holman, supra,* and *United States* v. *Jenison, supra*).[6] Were the post merely clerical in nature, there would be little reason for judges to seek out persons with "personal *leadership* qualities."[7]

There is, moreover, another consideration that the majority fails to address: the peculiar difficulty of detecting the harm caused by racist and sexist practices in the administration of criminal justice. We recognized in *Peters* v. *Kiff,* that it is in the nature of discriminatory selection processes "that proof of actual harm, or lack of harm, is virtually impossible to adduce . . . ." 407 U. S., at 504. In *Peters,* where the issue arose in the context of deciding whether to allow a white person to challenge discriminatory practices excluding Negroes, the opinion announcing the judgment stated that the consequences of uncertainty should fall upon the prosecution. That opinion therefore concluded that "[i]n light of the great potential for harm latent in an unconstitutional

---

[6] For example, in *United States* v. *Holman,* a District Judge testified that the foreperson should possess sufficient intellectual independence to prevent being "easily led by the United States Attorney." 510 F. Supp., at 1180. Similarly, in *United States* v. *Jenison,* a District Judge testified that he chose foremen on the basis of "work history" and "leadership ability." 485 F. Supp., at 665.

[7] The Court also maintains that an indicium of the purported insignificance of the foreman's position is that the absence of his signature on an indictment is deemed a mere technical irregularity that does not invalidate the indictment. *Ante,* at 344–345. This observation reveals nothing of significance about the functional importance of the foreman's position. The refusal to invalidate an indictment merely because it lacks the signature of the foreman simply reflects a practical recognition that important government objectives, otherwise justified on the basis of applicable law, should not be stymied on the basis of meaningless formalities. See, *e. g., United States* v. *Ventresca,* 380 U. S. 102, 108 (1965) (rejecting challenge to adequacy of search warrant affidavit because such documents must be "tested and interpreted . . . in a commonsense and realistic fashion").

jury-selection system, and the strong interest of the criminal defendant in avoiding that harm, any doubt should be resolved in favor of giving the opportunity for challenging the jury to too many defendants, rather than giving it to too few." *Ibid.* Likewise, in light of the potential for harm latent in the unconstitutional selection of a grand jury foreman by a district court judge, and a defendant's (and society's) strong interest in avoiding that harm, any doubt should be resolved in favor of applying standards that are too stringent rather than too lax.

### III

The consequence of the Court's misperception of the nature and dimensions of the constitutional violation that is assumed to have occurred is a misunderstanding of what constitutes an appropriate remedy. The majority declines "to embark upon the course of vacating criminal convictions because of discrimination in the selection of [grand jury] foremen" because "[l]ess Draconian measures will suffice to rectify the problem." *Ante,* at 349. Yet the Court never articulates what "less Draconian" measures it has in mind. It states that it is "fully satisfied that the district judges charged with the appointment of grand jury foremen will see to it that no citizen is excluded from consideration for service in that position on account of race, color, religion, sex, national origin, or economic status." *Ante,* at 349–350. Such assurance, however, is completely nonsensical since, in this case, the Court must assume that a District Judge did exclude persons on the basis of race and sex.

Determining the appropriateness of reversing petitioner's indictment requires applying the elementary, though oft-ignored, principle that every right must be vindicated by an effective remedy.[8] For " '[i]f constitutional rights are to be

---

[8] See *Marbury* v. *Madison,* 1 Cranch 137, 163 (1803) ("The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right").

anything more than pious pronouncements, then some measurable consequence must be attached to their violation.'" *United States* v. *Calandra*, 414 U. S. 338 (1974) (BRENNAN, J., dissenting, joined by MARSHALL, J.) (quoting Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 756 (1970)). It would be intolerable if the constitutional prohibition against discrimination in the selection of grand jury foremen could be violated without practical consequence. The traditional remedy for unconstitutional government action is that which petitioner requests: nullification. Nullification is especially appropriate here where there is an absence of any other remedy that is even remotely effective.

The Court declares by fiat that dismissing petitioner's indictment would constitute a "Draconian" measure. Missing from the Court's opinion, however, is any indication that the Court considered factors essential to determining the proper scope of a remedy. The inchoate nature of the majority's reasoning is especially regrettable since the Court engaged in a comprehensive explication of an appropriate balancing analysis in *Rose* v. *Mitchell*, 443 U. S., at 553–559.

In *Rose*, the Court reaffirmed its rejection of the view that the social costs of dismissing an indictment outweigh the costs imposed by a less effective remedy. It recognized that there are substantial costs imposed by dismissing an indictment following conviction—*i. e.*, the costs attendant to retrying a defendant. It determined, however, that those costs were "outweighed by the strong policy the Court consistently has recognized of combating racial discrimination in the administration of justice." *Id.*, at 558. In making that determination, the Court took into account two considerations. First, the Court looked to the types of remedies courts resort to in rectifying and deterring analogous constitutional violations. The Court observed that dismissal of an indictment is in many ways less drastic than remedies resorted to in other contexts where constitutional rights have

been violated. *Id.*, at 557–558. In the case of an illegal search or a coerced confession, the violation often results in the suppression of evidence that is highly probative on the issue of guilt. Dismissing an indictment, however, does not render a defendant practically immune from subsequent re-indictment and reprosecution. In the subsequent reprosecution, the Government remains free to use the proof it initially introduced to obtain the conviction in the first instance. Second, the Court looked to the efficacy of alternative remedies. It recognized that there exists a criminal statute prohibiting discriminatory selection practices with respect to grand juries and that such illicit practices are also actionable in civil suits. The Court noted, however, that the inadequacies[9] of these alternative remedies disabled them from assuming alone the burden of discouraging purposeful discrimination in the selection of grand jury foremen. A similar calculus would yield a similar result in this case.

## IV

There is no doubt that this Court has the legitimate authority to order relief that would effectively deter federal judges from purposefully discriminating against Negroes and women in the selection of grand jury foremen. It has done so in similar contexts by ordering the dismissal of indictments against defendants convicted in both federal and state courts, and it has done so to vindicate both federal constitutional rights and its own supervisory authority over the proper administration of justice within the federal judiciary.[10]

---

[9] The Court noted that 18 U. S. C. § 243 makes it a federal crime to exclude citizens from service on grand and petit juries on account of race. It recognized, however, that prosecutions under § 243 have been rare and that they "are not under the control of the class members and the courts." 443 U. S., at 558. The Court further recognized that "[c]ivil actions, expensive to maintain and lengthy, have not often been used." *Ibid.*

[10] In *Ballard v. United States*, 329 U. S. 187 (1946), the Court dismissed an indictment against a convicted defendant on the ground that women had

The discriminatory conduct at issue resides within the four corners of the federal judicial process, an area uniquely amenable to this Court's influence. And the constitutional principles and federal policies violated by this conduct are among the most definite, basic and deeply rooted in all of our jurisprudence.[11] I therefore find the opinion of the Court both misguided and mysterious. If the Court is serious when it declares that it can "[i]n no sense . . . countenance" race and sex-based discrimination in the selection of federal grand jury foremen, *ante*, at 349, then it surely subverts its own declaration by both refusing to grant the long-established remedy petitioner requests and declining to offer even a glimpse of effective alternative remedies. I respectfully dissent.

JUSTICE STEVENS, dissenting.

A rule that forbids discrimination in the selection of a grand jury must be justified primarily by the overriding interest in maintaining the integrity of the judicial process— both the actual fairness of that process and the symbolic values that it embodies. As I understand the Court's prior cases, it is settled that the process that leads to a State's deprivation of a person's liberty is not "due process" if the selection of the grand jury that indicted the defendant was tainted by racial prejudice. That principle applies to the grand jury foreman, for he performs a function that has both practical and symbolic significance. See *Rose* v. *Mitchell*, 443 U. S. 545 (1979). Although I have expressed my doubts

---

been systematically excluded from his grand jury even though, at that time, Congress had not expressly prohibited disqualification of federal jurors on account of sex. Legislation now expressly provides that "[n]o citizen shall be excluded from service as a grand or petit juror . . . on account of race, color, religion, sex, national origin, or economic status." 28 U. S. C. § 1862.

[11] See, *e. g.*, *Strauder* v. *West Virginia*, 100 U. S. 303 (1880); *Smith* v. *Texas*, 311 U. S. 128 (1940). See also 18 U. S. C. § 243; 28 U. S. C. § 1862.

concerning the wisdom of applying this principle in certain situations, see *id.*, at 593–594 (STEVENS, J., dissenting in part), if we enforce the principle in state proceedings, surely we must insist on adherence to the same standard in the federal judicial system. Accordingly, I join JUSTICE MARSHALL's dissenting opinion.